NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

SOUTHWEST STAGE FUNDING, LLC, *Plaintiff/Appellee,*

*v.*

MICHAEL JONES, et al., *Defendants/Appellants.*

No. 1 CA-CV 25-0117

FILED 02-18-2026

---

Appeal from the Superior Court in Maricopa County
No. CV2024-011024
The Honorable Erik Thorson, Judge

**AFFIRMED**

---

COUNSEL

Littler Mendelson, P.C., Phoenix
By Kristy L. Peters, Carlos B. Gutierrez
*Counsel for Plaintiff/Appellee*

May, Potenza, Baran & Gillespie, P.C., Phoenix
By Devin Sreecharana, Carrie A. Laliberte, Andre S. Lishko,
Trevor J. Wainfeld
*Counsel for Defendants/Appellants*

_____

**MEMORANDUM DECISION**

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Vice Chief Judge David D. Weinzweig and Judge Cynthia J. Bailey joined.

_____

**P E R K I N S**, Judge:

**¶1**　　　　This case involves a group of employees who left Southwest Stage Funding, LLC d/b/a Cascade Financial Services ("Cascade") in March 2024 to join competitor CalCon Mutual Mortgage, LLC d/b/a OneTrust Home Loans ("CalCon"). Before leaving, several employees took thousands of pages of Cascade's confidential business information. After joining CalCon, two employees who had signed agreements not to compete or to solicit Cascade's customers violated those agreements. Cascade sued and obtained a preliminary injunction.

**¶2**　　　　Three former Cascade employees, Michael Jones, Dion Jones, and James Beanblossom, and CalCon (collectively "Appellants") appeal the preliminary injunction and the amount of bond imposed to secure the injunction. Because we can offer no relief, we affirm the grant of the injunction and decline to interfere with the court's discretion in setting a bond amount.

## FACTS AND PROCEDURAL BACKGROUND

**¶3**　　　　The proceedings before us arise from a complex series of events. We summarize the relevant facts, viewing them in the light most favorable to upholding the superior court's order. *IB Property Holdings, LLC, v. Rancho Del Mar Apartments Ltd. P'ship*, 228 Ariz. 61, 63, ¶ 2 (App. 2011).

### 1.　Cascade's Business

**¶4**　　　　Cascade specializes in offering manufactured home loans and is the only national lender offering certain government-backed loan programs.

**¶5**　　　　Cascade's business depends on relationships with manufactured home retailers—the companies that sell manufactured homes to buyers. Typical manufactured home purchasers go to a retailer's

lot to pick out a home and need financing, so the retailers refer them to trusted lenders like Cascade.

¶6        Retailer locations display "lender boards" that showcase lenders the retailers trust to close deals. Getting on these boards takes significant time and effort, so Cascade employs Business Development Managers ("BDMs") who travel to retailer locations, build relationships, provide information about Cascade's loan products, and serve as contacts when issues arise. Cascade provides its BDMs with marketing materials and budgets to support their efforts. It can take months before a retailer even completes Cascade's application to become a referral source, and a year or more to fully develop the relationship and start getting leads. Cascade also employs Regional Sales Managers ("RSMs") who do BDM work while also supervising existing BDMs, training new ones, and transitioning retailer relationships when BDMs change.

¶7        Over its 25 years in business, Cascade developed confidential business information including loan processes, pricing methods, training materials, underwriting guidelines (including unpublished guidance on handling complex situations), and detailed data about which retailers provide the most valuable referrals. Cascade protects this information with passwords, security controls, and company policies prohibiting employees from disclosing confidential information or emailing it to personal accounts.

## 2.  The Employees

¶8        Michael Jones started at Cascade in 2008 as a BDM. He became Cascade's national sales trainer and, in April 2020, an RSM for the Southwest region. When he became an RSM, he signed a new employment agreement, promising not to disclose confidential information, compete with Cascade, or solicit Cascade's customers for 12 months after leaving the company. In May 2022, he returned to a BDM role until resigning in February 2024.

¶9        Dion Jones started at Cascade in 2014 as a BDM. In April 2020, he became RSM for the Southeast region and signed the same restrictive employment agreements as Michael. He stayed in that role until March of 2024. As RSMs, Michael and Dion had access to Cascade's confidential information for all territories nationwide, not just their own regions.

¶10        James Beanblossom worked as a loan officer at Cascade from October 2019 until March 2024. He did not sign restrictive agreements. Another former employee, Cami O'Connor, worked in various roles at

Cascade between September 2012 and March 2024, resigning as director of origination. She signed similar restrictive employment agreements to those Michael and Dion signed. Cami is not a party to this appeal.

### 3. CalCon's Recruitment

**¶11**        In early 2024, CalCon wanted to expand its manufactured home lending business, and Jason Huffman, a CalCon Vice President, led this effort. He contacted three senior Cascade managers about joining CalCon, which led to the recruitment of their Cascade subordinates, including Michael, Dion, James, and Cami. Around March 2024, 15 Cascade employees resigned and joined CalCon. CalCon hired all 15 without interviewing any of them, nearly doubling CalCon's existing manufactured home lending team.

### 4. Taking Cascade's Information

**¶12**        Before leaving Cascade, several employees took substantial amounts of Cascade's internal information.

**¶13**        James emailed himself spreadsheets with dates, amounts, and borrower and retailer information about 215 loans he had handled and 900 Texas loans handled by other loan officers. After joining CalCon, he forwarded these to his CalCon email.

**¶14**        Cami sent herself 60 emails containing nearly 2,900 pages of Cascade's lending guidelines, loan modification procedures, underwriting policies with unpublished guidance, and data about the retailers generating the most profits for Cascade. Cami still possessed Cascade documents on her personal computer at the time of the evidentiary hearing on the preliminary injunction.

**¶15**        Michael emailed himself lists of Cascade's top retailers. He also had thumb drives with Cascade information, which he deleted after Cascade sued.

**¶16**        Dion emailed himself a presentation showing Cascade's sales projections for each BDM and compensation plan details.

### 5. What Happened After They Left

**¶17**        After joining CalCon, Michael and Dion contacted retailers they had worked with at Cascade and encouraged them to send business to CalCon instead. Within six months, CalCon increased its retailer

relationships by more than 240, from 321 to 563. And CalCon's loan closings increased significantly compared to the prior year.

¶18 Meanwhile, Cascade's business suffered. Losing 15 employees, including half its loan officers, left Cascade struggling to serve clients. Many retailers stopped sending business to Cascade or significantly reduced their referrals. Loan cancellations increased, and loan volume dropped, even though the manufactured housing market grew overall.

## 6. Superior Court Proceedings

¶19 In May 2024, Cascade sued several employees, including Michael, Dion, James, and Cami, for breach of contract (the restrictive agreements) and breach of employee duty of loyalty. And it sued them, along with CalCon, for helping employees breach their duties, interfering with business relationships, unfair competition, and trade secret violations. Cascade also moved for a preliminary injunction.

¶20 At a later May 2024 hearing, Appellants agreed not to "disclose or use any of Cascade's confidential or trade secret information that they possess or took from Cascade." Despite the stipulation, James forwarded Cascade's internal information to his CalCon email account in June 2024.

¶21 In September 2024, the trial court held a full-day evidentiary hearing and, in December, issued a detailed ruling granting the preliminary injunction. The court found that: (1) CalCon recruited Cascade employees and hired them without interviews; (2) the information employees took was confidential and constituted trade secrets; (3) Michael and Dion were now working for a competitor doing the same work with some of the same retailers; (4) Michael and Dion solicited retailers they worked with at Cascade; (5) Cascade had a protectable interest in its referral sources; (6) Michael and Dion's restrictive agreements were reasonable; and (7) Michael and Dion violated those agreements.

¶22 The injunction included nine restrictions that prevented:

(1) Michael and Dion "from competing with Cascade within the restricted territory for the restricted period, which shall run for twelve months after their last date of employment";

(2) Michael and Dion "from soliciting or interfering with Cascade's customers and borrowers, including the retailers, within the restricted period";

(3) Michael, Dion, and James "from disclosing or using Cascade's confidential and trade secret information";

(4) CalCon from assisting the individual employees' "tortious conduct in breaching their duty of loyalty to Cascade";

(5) Appellants "from tortiously interfering with Cascade's business relationships and expectations with its customers and borrowers, including the retailers";

(6) Michael and CalCon from violating the Texas Uniform Trade Secrets Act;

(7) Dion and CalCon from violating the Florida Uniform Trade Secrets Act;

(8) Cami, James, and CalCon from violating the Arizona Uniform Trade Secrets Act; and

(9) Appellants "from unfairly competing with Cascade by misappropriating and using Cascade's confidential information."

**¶23**      The court then set a $10,000 bond to secure the injunction. Appellants timely appealed and we have jurisdiction. A.R.S. § 12-2101(A)(5)(b).

## DISCUSSION

**¶24**      Appellants argue that the superior court abused its discretion in granting the preliminary injunction because: (1) Cascade failed to meet its burden in justifying a preliminary injunction, and (2) the injunction was vague and overbroad. And they contend the court abused its discretion in setting a bond amount.

**¶25**      "Granting or denying a preliminary injunction is within the sound discretion of the trial court, and its decision will not be reversed absent an abuse of that discretion." *IB Property Holdings, LLC*, 228 Ariz. at 64, ¶ 5 (citation omitted).

## 1.  The Injunction

**¶26**      The preliminary injunction provided relief based on Cascade's claims raised in its First Amended Verified Complaint. Those claims rested on two general bases: (A) alleged improper use of the confidential information and trade secrets taken by the employees before

leaving to join CalCon and (B) alleged violations of the restrictive covenants in the employment contracts for Michael, Dion, and Cami. We can offer Appellants no relief from the restrictions given these bases.

¶27 Appellants' May 2024 agreement not to "disclose or use any of Cascade's confidential or trade secret information that they possess or took from Cascade" remains a binding stipulation. At oral argument before this court, Appellants claimed to have reserved the right to challenge their broad stipulation, pending further clarification by the superior court on what constituted confidential or trade secret information. But the superior court's May 24, 2024 minute entry reflects no timely objection, reservation of rights, or other limitation on the stipulation. And Appellants did not provide a transcript of the hearing on appeal. ARCAP 11(c). Appellants also failed to challenge the stipulation at any subsequent superior court proceeding or on appeal.

¶28 And, at oral argument before this court, both sides acknowledged the restrictive covenants have long expired. Thus, the passage of time has rendered any relief related to restrictions based on such covenants moot.

¶29 We address each specific injunction restriction in light of these two threshold considerations below.

¶30 Injunction restrictions (3), (6), (7), (8), and (9) all restrict Appellants' ability to use or disclose Cascade's confidential information or trade secrets. Appellants' broad stipulation restricts Appellants to the same, if not broader, extent as the injunction. And Appellants acknowledged being bound by it during the preliminary injunction proceedings and on appeal. So relief on appeal would not affect the stipulation and would do Appellants no good.

¶31 Injunction restrictions (1) and (2) expired in March 2025. An appeal is generally moot if our review will not affect the parties. *Cardoso v. Soldo*, 230 Ariz. 614, 617, ¶ 5 (App. 2012). We have recognized exceptions for issues of great public importance, issues capable of repetition yet evading review, and when collateral consequences continue to affect the party. *Id.* But fact-intensive questions are unlikely to affect the public at large, and Cascade has no basis to request another injunction, so there is no risk of a repeat. *Id.* at ¶¶ 7–8. The superior court imposed attorney fee sanctions on Appellants for violations of the preliminary injunction restrictions, and Appellants point to them as collateral consequences warranting our review. We decline to extend the collateral consequences

7

doctrine to attorney fee sanctions that have no ongoing legal consequences and will not harm Appellants' reputation. *See id.* at 617–18, ¶¶ 9–10. The passage of time has rendered Appellants' challenges to restrictions (1) and (2) moot.

**¶32** Restriction (4) enjoins CalCon from "aiding and abetting [individual defendants'] tortious conduct in breaching their duty of loyalty to Cascade." The complaint's fourth claim and the amended preliminary injunction request identify the conduct of concern, which took place while Appellants were employed at Cascade and included the misappropriation of confidential information and soliciting customers and co-workers. CalCon allegedly assisted in that conduct. But the employees are no longer with Cascade, and the non-solicit restriction no longer applies. If any conduct remains restricted by this provision, the parties' May 2024 stipulation renders any relief we could offer ineffective.

**¶33** Restriction (5) faces similar infirmity. It enjoins all Appellants "from tortiously interfering with Cascade's business relationships and expectations with its customers and borrowers, including the retailers." The complaint's fifth claim, intentional interference with business relationships and expectancies, describes the offending conduct as using "unlawful means, including the misappropriation of confidential information, to interfere with existing and legally protectable relationships and prospective relationships with Cascade's customers and borrowers." In its preliminary injunction request, Cascade accused Appellants of "utilizing Cascade's confidential information to unfairly compete with Cascade and solicit [its] customers and borrowers to move to CalCon." So restriction (5) targets conduct that CalCon has already stipulated not to engage in—use of confidential information—or that the non-solicitation provisions no longer restrict.

**¶34** Because we can offer no meaningful relief, we affirm the injunction.

## 2. The Bond

**¶35** Appellants challenge the superior court's decision to set the bond amount at $10,000. Cascade requested the $10,000 amount, basing it on Michael and Dion's salaries for the little-over-two-months remaining from the injunction. CalCon requested $687,300 for estimated revenue loss, salaries to be paid to individual defendants, and estimated attorney fees.

**¶36** The superior court has discretion over bond amounts to secure payment of "costs and damages sustained by any party found to

8

have been wrongfully enjoined," and the movant must give security "in such amount as the court considers proper." Ariz. R. Civ. P. 65(c)(1). We decline to second-guess the court's decision not to include speculative commission and revenue losses that depend on assumptions about the number of retailer referrals converted to loans closed. And nothing required the court to include attorney fees in the bond, even though those may ultimately be recoverable. *See Smith v. Coronado Foothills Ests. Homeowners Ass'n*, 117 Ariz. 171, 173 (1977) (affirming recovery in excess of the bond in the temporary restraining order context).

### 3. Attorney Fees on Appeal

**¶37**        Both Appellants and Cascade request attorney fees and costs, pursuant to ARCAP 21, Arizona Revised Statutes Sections 12-341, -341.01, and the corresponding provisions in Michael and Dion's employment agreements. We award Cascade its reasonable fees and its costs upon compliance with ARCAP 21.

### CONCLUSION

**¶38**        We affirm.

